**The GROUP AGAINST SMOG AND POLLUTION, INC., et al., Petitioners,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent,**

**American Iron and Steel Institute, Intervenor.**

**No. 78–1534.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 20, 1979.

Decided Sept. 23, 1981.

Frances Dubrowski, Washington, D. C., with whom Richard E. Ayres, Washington, D. C. and Patrick C. McGinley, Morgantown, W. Va., was on the brief, for petitioners.

Patrick J. Cafferty, Jr., Atty., Dept. of Justice, Washington, D. C., with whom James W. Moorman, Asst. Atty. Gen., and Angus MacBeth, Atty., Dept. of Justice, Joan Z. Bernstein, Gen. Counsel, and Earl Salo, Atty., Environmental Protection Agency, Washington, D. C., were on the brief, for respondent.

Roger M. Golden, Washington, D. C., was on the brief for intervenor.

Before ROBINSON, Chief Judge, ROBB, Circuit Judge, and DAVIS,* Judge.

Opinion for the Court filed by Chief Judge SPOTTSWOOD W. ROBINSON, III.

Separate Statement filed by Circuit Judge ROBB.

* Of the United States Court of Claims, sitting by designation pursuant to 28 U.S.C. § 293(a)

(1976).

SPOTTSWOOD W. ROBINSON, III, Chief Judge:

Petitioners, various environmental groups,[1] attack regulations, promulgated by the Environmental Protection Agency (EPA) under the Clean Air Amendments of 1970,[2] setting air pollution control standards for basic oxygen process furnaces (BOPFs) used in the production of steel.[3] Petitioners accuse EPA of arbitrariness in confining the scope of those rules to BOPF emissions which are captured and vented through a plant's smokestacks, thus permitting other —"fugitive"—BOPF emissions to enter the atmosphere without treatment. EPA contends that petitioners' bid for judicial review, implicating as it does a regulatory step four years old, is jurisdictionally out of time, and that in any event the agency action must be sustained on the merits.

We find that the instant challenge is in effect a petition to revise and broaden a preexisting BOPF standard on the basis of new information, and as such is not untimely.[4] We then conclude that EPA acted reasonably in responding to that application by resolving to conduct a separate rulemaking proceeding with a view to possible amendment of the regulations, instead of giving them that sort of consideration during the course of a proceeding earlier initiated for a much more limited purpose.[5] Accordingly, we affirm.

## I. BACKGROUND

### A. Fugitive Emissions

Basic oxygen process furnaces have become the principal means of raw steel production in the United States. Employing high-pressure oxygen during fabrication, they turn out steel more quickly and in greater quantities than was ever possible by the use of traditional furnaces.[6] These gains in higher yield, however, have not been achieved without some environmental losses. Enormous amounts of particulate matter and toxic gas are released as oxygen is forced into the furnace at sonic speeds.[7] Most are collected by a giant stationary control hood mounted above the furnace.[8] These so-called stack, or primary, emissions are then ducted away to the plant's pollution control equipment,[9] where substantially all particulate matter is removed before the air thus cleaned is vented into the atmosphere through a smokestack. Other emissions, however—notably those which escape the furnace when it is tipped away from the hood during loading or pouring operations—never enter the pollution control system. Instead, these secondary, or "fugi-

1. Petitioners include the Natural Resources Defense Council, Inc., Friends of the Earth, Inc., and the Group Against Smog and Pollution.

2. Pub.L. No. 91–604, 84 Stat. 1676 (1970), amending the Clean Air Act, 42 U.S.C. §§ 7401–7626 (Supp. III 1979) [hereinafter cited as codified].

3. EPA Standards of Performance for Iron and Steel Plants, 40 C.F.R. §§ 60.140–60.144 (1980).

4. Discussed in Part II(A) infra.

5. Discussed in Part II(C) infra.

6. See EPA Inspection Manual for Enforcement of New Source Performance Standards, Basic Oxygen Process Furnaces §§ 3.0, 3–1 (Jan. 1977), Appendix (App.) 100.

7. As much as 40 pounds of particulate matter is emitted per ton of steel, and a typical 250-ton basic oxygen process furnace is capable of producing 470 tons of steel per hour. EPA Background Information for Proposed New Source Performance Standards, vol. 1, 50 (June 1973), App. 7. See generally EPA Background Information for an Opacity Standard of Performance for Basic Oxygen Process Furnaces in Iron and Steel Plants 4–5 (Mar. 1977), App. 77–78.

8. The two types principally in use in the United States are closed hoods, which fit closely around the top of the furnace, and open hoods, which are suspended about two feet above the furnace rim. Open hoods are more easily serviced and maintained, but closed hoods promote better pollution control. See EPA Background Information for Proposed New Source Performance Standards, vol. 1, 50–53 (June 1973), App. 7–10.

9. EPA has approved two kinds of particulate removal systems for use in conjunction with either open or closed hoods: high energy venturi scrubbers, which employ water droplets to collect particles from gas streams, and electrostatic precipitators, which utilize electrical charges to accomplish the same result. See id. at 54, App. 11.

tive," emissions enter the atmosphere untreated, either through ventilation holes in the roof or other openings in the building housing the furnace.[10] Current nonregulation of these latter emissions is the matter lying at the heart of the controversy before us.

## B. *Administrative Action*

By Section 111 of the Clean Air Amendments of 1970, Congress instructed EPA to identify categories of stationary sources of air pollution that endanger the public health or welfare,[11] and to promulgate regulations establishing standards of performance for new facilities within each category.[12] These standards, that section commands, must reflect what in EPA's judgment is the best emission reduction technology available, taking cost and other factors into consideration.[13] Pursuant to these directives, EPA issued a notice on June 11, 1973, adding iron and steel plants [14] to the list of stationary pollution sources already found in need of regulation,[15] and simultaneously issued proposed performance standards for new steel mills employing basic oxygen process furnaces.[16]

As proposed, the regulations were directed only to BOPF stack emissions; there was no provision curbing fugitive emissions.[17] EPA justified this difference on the ground that the best available technology for BOPF emission reduction dealt only with primary, not secondary, emissions, and consequently that development of a fugitive emission standard was unfeasible.[18] Additionally, the proposed rules contained two BOPF performance standards—one limiting the concentration of particulate matter released from the stack,[19] and the other measuring the opacity of stack emissions [20] —which were designed to supplement each

---

**10.** See *id.* at 50, App. 7.

**11.** 42 U.S.C. § 7411(b)(1)(A) (Supp. III 1979), providing:

The Administrator [of EPA] shall, within 90 days after December 31, 1970, publish (and from time to time thereafter shall revise) a list of categories of stationary sources. He shall include a category of sources in such list if in his judgment it causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare.

**12.** *Id.* § 7411(b)(1)(B) (Supp. III 1979).

**13.** *Id.* § 7411(a)(1) (Supp. III 1979), specifying in relevant part that

a standard of performance shall reflect the degree of emission limitation and the percentage reduction achievable through application of the best technological system of continuous emission reduction which (taking into consideration the cost of achieving such emission reduction, any nonair quality health and environment impact and energy requirements) the Administrator determines has been adequately demonstrated.

**14.** Also identified were asphalt concrete plants, petroleum refineries, storage vessels for petroleum liquids, secondary lead smelters, secondary brass and bronze ingot production plants, and sewage treatment plants. 38 Fed.Reg. 15380 (1973).

**15.** EPA previously had identified steam generators fired by fossil fuels, incinerators, portland cement plants, nitric acid plants and sulfuric acid plants as categories of stationary sources of air pollution. *Id.* at 24877.

**16.** *Id.* at 15380, 15411.

**17.** See *id.* at 15380, 15406–15407, 15411.

**18.** See EPA Background Information for New Source Performance Standards, vol. 3, 134 (Feb. 1974), App. 23. Both the open and closed hood systems permit secondary emissions to escape without treatment. See EPA Background Information for Proposed New Source Performance Standards, vol. 1, 50 (June 1973), App. 7.

**19.** 38 Fed.Reg. 15380, 15411 (1973). The proposed particulate standard limited such emissions to 50 milligrams per dry cubic meter at normal conditions (50 mg/Nm³) or .022 grains per dry cubic foot at standard conditions (0.022 gr./dscf). *Id.*

**20.** *Id.* at 15380, 15411 (1973). Opacity is defined as "the degree to which emissions reduce the transmission of light and obscure the view of an object in the background." 40 C.F.R. § 60.2 (1980). Opacity is measured in percentages, with 0 percent indicating no visible emissions and 100 percent indicating emissions that completely obscure the background. The proposed BOPF opacity standard prohibited stack emissions exhibiting 10 percent opacity or greater, except for 2 minutes in any one hour. 38 Fed.Reg. 15380, 15411 (1973).

other as enforcement tools.[21] Although the concentration, or mass, standard is the more precise of the two measurements, it also is considerably more expensive and time-consuming to utilize,[22] and thus is impracticable to implement on a permanent or even on a frequent basis. The opacity standard, on the other hand, although less accurate requires no more than mere on-site observation of a plant's stack emissions by relatively untrained inspectors who can, periodically and without advance warning, visit a facility and quickly conduct compliance reviews.[23]

EPA invited comments on the proposed rules, and on March 8, 1974, promulgated final performance standards for basic oxygen process furnaces.[24] The final mass standard was virtually identical to the one that had been proposed,[25] but the opacity standard was withdrawn pending additional study of various technical problems.[26] EPA made known its intention, however, to devise another BOPF opacity standard as soon as practicable.[27] Petitioners did not then challenge either the exclusion of fugitive emissions or the absences of an opacity standard from the final regulations.

Three years later, EPA proposed a new opacity standard for BOPF stack emissions.[28] Petitioners and others submitted comments thereon, arguing among other things that because of improved technology in the capture and treatment of fugitive emissions, any BOPF performance standard that failed to address pollution resulting therefrom was violative of the Act.[29] Without disputing petitioners' technological claim, EPA concluded that fugitive emission control was beyond the scope of a rulemaking proceeding instigated to fashion only a primary emission opacity standard.[30] Accordingly, on April 13, 1978, EPA issued a final opacity regulation,[31] and also announced that it would review the regulations to determine whether BOPF performance standards ultimately should extend to both primary and secondary emissions.[32] Indeed, eleven months later the agency gave notice of its intention to propose revised BOPF performance standards that would govern emissions of both types.[33]

Meanwhile, on June 12, 1978, petitioners, dissatisfied with the agency's response, sought review in this court of the final opacity standard. Petitioners assail the opacity standard principally on the ground that the record assertedly does not support EPA's exemption of fugitive emissions from the regulations into which that standard was incorporated.[34] In a parallel assault, petitioners contend that the agency acted arbitrarily in not adequately explaining its decision to deal only with primary emissions.[35] EPA not only resists these claims, but argues in turn that petitioners' presentation of these objections in an allegedly untimely fashion deprives this court of jurisdiction to entertain them.[36] Alternative-

21. 39 Fed.Reg. 9308–9309 (1974).

22. *Id.* at 9308, 9309.

23. *Id.*

24. *Id.* at 9308, 9318–9319.

25. *Id.* at 9308, 9312.

26. *Id.* There were comments that it was inappropriate for basic oxygen process furnaces, which operate in cycles that do not generate consistent levels of pollution, and because additional testing by the agency had revealed unexplained variations in opacity readings from plants using approved BOPF emission reduction systems. *Id.* See notes 8–9 *supra.*

27. 39 Fed.Reg. 9308, 9312 (1974).

28. 42 Fed.Reg. 12130, 12131 (1977). The proposal was to prohibit stack emissions exhibiting 10% opacity or greater, except once per steel production cycle when emissions could exhibit as much as 19% opacity.

29. See App. 82–98.

30. 43 Fed.Reg. 15600 (1978).

31. *Id.*

32. *Id.*

33. 44 Fed.Reg. 17460, 17461 (1979).

34. Brief for Petitioners at 20–28.

35. *Id.* at 28–32.

36. Brief for Respondent at 16–21.

ly, the agency asserts that in any event its later decision[37] to revise its performance standards to include BOPF fugitive emissions by early 1982 moots the entire controversy.[38]

## II. ANALYSIS

### A. *Timeliness*

◼ We first consider EPA's contention that petitioners' challenge to the exclusion of fugitive emissions from the ambit of the final BOPF opacity standard and the regulations of which it became a part is out of time jurisdictionally. In support of this position, EPA relies upon former Section 307(b)(1) of the Act, which provided that petitions for review of performance standards formulated under Section 111 must be filed "within 30 days from the date of such promulgation."[39] EPA asserts that the decision not to regulate fugitive emissions was made on March 8, 1974, when the final mass standard for BOPF primary emissions was promulgated, and urges that the time for judicial attacks on that decision has long since expired. EPA does not dispute that the petition for review was filed within the statutorily-prescribed period following promulgation of the final opacity standard; instead, the agency argues that because the opacity standard is merely an additional tool for monitoring compliance with the previously-established particulate standard for stack emissions,[40] petitioners were on notice as early as 1974 that the opacity standard, whenever issued in final form,

would not encompass fugitive emissions. Thus, EPA says, having failed to litigate the proper scope of the final mass standard, petitioners are foreclosed from now doing so in the guise of a challenge to the final opacity standard.

While EPA's theory has a modicum of surface appeal, it does not withstand scrutiny. Were petitioners merely attempting, as EPA insists, to attack collaterally a decision they could and should have resisted years earlier, we would not hesitate to dismiss the petition for review as untimely.[41] The agency ignores, however, the final words of Section 307(b)(1), which unambiguously proclaim that petitions may be filed after the 30-day limit if based "solely on grounds arising after such 30th day."[42] We have had occasion in the past to consider this proviso, as well as the legislative history that gave it birth,[43] and have noted the congressional purpose in allowing later review based upon new information:

[I]t would not be in the public interest to measure for all time the adequacy of a promulgation of any standard or regulation by the information available at the time of such promulgation. In the area of protection of public health and environmental quality, it is clear that new information will be developed and that such information may dictate a revision or modification of any promulgated standard or regulation established under the act. The judicial review section, therefore, provides that any person may challenge any promulgation whenever it is

---

**37.** See note 33 *supra* and accompanying text.

**38.** See Brief for Respondent at 21.

**39.** 42 U.S.C. § 1857h–5(b) (1976), providing in pertinent part:

A petition for review of action of the Administrator in promulgating . . . any standard of performance under (Section 111) . . . may be filed only in the United States Court of Appeals for the District of Columbia. . . . Any such petition shall be filed within 30 days from the date of such promulgation, or after such date if petition is based solely on grounds arising after such 30th day.

Section 307(b)(1) was amended in 1977 to provide for judicial review within 60 days of agency action. See 42 U.S.C. § 7607(b)(1) (Supp. III 1979).

**40.** See text *supra* at notes 21–23.

**41.** See, *e.g., Granite City Steel Co. v. EPA,* 501 F.2d 925 (7th Cir. 1974).

**42.** See note 39 *supra*.

**43.** See *Oljato Chapter of Navajo Tribe v. Train,* 169 U.S.App.D.C. 195, 197–202, 515 F.2d 654, 656–661 (1975).

alleged that significant new information has become available.[44]

Moreover, EPA itself has set forth in laudable detail procedures, which this court has explicitly endorsed,[45] for seeking revision of a preexisting performance standard:

(1) The person seeking revision of a standard of performance, or any other standard reviewable under § 307, should petition EPA to revise the standard in question. The petition should be submitted together with supporting materials, or references to supporting materials.

(2) EPA should respond to the petition and if it denies the petition, set forth its reasons.

(3) If the petition is denied, the petitioner may seek review of the denial in this court pursuant to § 307.[46]

Here, petitioners presented to EPA considerable evidence that the technology of capturing and controlling secondary emissions had advanced since the agency decided in 1974 to omit fugitive emissions from coverage by the regulations.[47] The validity of that decision is now disputed on the ground that it is no longer based on the best emission reduction technology available, as the Act requires.[48] We are mindful that this evidence was submitted in the form of comments on the proposed final BOPF opacity standard, rather than in a formal petition to revise the preexisting

mass standard, and whether a presentation of that sort always will satisfy the statutory and agency procedures for revising regulations and standards is a question we need not now decide. Whatever EPA's future response to such submissions might be, it appears here to have taken heed of petitioners' comments on fugitive emissions and to have acted in consonance with them, for in issuing the final opacity standard the agency addressed them as follows:

EPA recognizes that fugitive emissions from BOPF shops are an important problem. However, it was not within the scope of this evaluation to consider an opacity standard for fugitive emissions. . . . EPA will be reviewing the standards of performance for new BOPF's in accordance with the 1977 amendments to the Clean Air Act.[49] This review will address the need for limits on fugitive emissions as well as any revisions of the particulate concentration and opacity standards.[50]

And, as we noted above,[51] EPA subsequently announced its intention to propose amendments to the BOPF standards, including revisions intercepting fugitive emissions.

We conclude, then, that petitioners' failure to mount a judicial challenge to the exclusion of fugitive emissions from coverage by the regulations when originally pro-

---

**44.** *Id.* at 201, 515 F.2d at 660. See also S.Rep. No. 91–1196, 91st Cong., 2d Sess., 41–42 (1970).

**45.** *Oljato Chapter of Navajo Tribe v. Train,* supra note 43, 169 U.S.App.D.C. at 207, 515 F.2d at 666. In doing so, we held that not until someone has brought new information to the agency's attention will this court have jurisdiction under § 307 to review the agency's response. *Id.*

**46.** *Id.*

**47.** See Comments of Natural Resources Defense Council, Inc., on Proposed Opacity Standards for Basic Oxygen Process Furnaces, (Apr. 29, 1977), App. 86–98. Additionally, petitioners later discovered that evidence of such technological advances existed in EPA's own files, and moved this court to supplement the record with the documents on file. See Petitioners' Motion to Supplement the Record (filed Nov. 13, 1978). EPA opposed the motion on

the ground that the records were irrelevant. See Respondent's Memorandum in Opposition to Petitioners' Motion to Supplement the Record (filed Dec. 18, 1978). We granted the motion. *Group Against Smog & Pollution v. EPA,* 665 F.2d 1284 (D.C.Cir.1979) (order); see *EDF v. Blum,* 458 F.Supp. 650 (D.D.C.1978).

**48.** See 42 U.S.C. § 7411(a) (Supp. III 1979), quoted in relevant part supra note 13.

**49.** *Id.* § 7411(b)(1)(B) (Supp. III 1979), providing, among other things, for EPA's review of performance standards at least once every four years and revision of such standards if appropriate.

**50.** 43 Fed.Reg. 15600 (1978), App. 104.

**51.** See text supra at note 33.

mulgated did not preclude them from later seeking judicial review of the agency's subsequent refusal to revise the standard on the basis of new information.

### B. *Mootness*

■ EPA also asserts that its decision to promulgate by early 1982 new BOPF performance standards that will extend to fugitive emissions moots the instant controversy.[52] In light of the protracted nature of these agency proceedings,[53] and continuing uncertainty as to when revised regulations will finally be adopted,[54] we believe the case still exhibits the requisite level of liveliness.[55] Despite EPA's projected publication of proposed new regulations by April, 1981,[56] they have yet to come forth. Indeed, EPA recently notified the court of its estimate that a proposed standard on fugitive emissions will not be available before January, 1982,[57] and we have no real assurance that even that will be the case.[58] Accordingly, we proceed to consider the merits of petitioners' claims.

### C. *The Administrative Decision*

■ Treating petitioners' challenge as a petition to revise, our task is to determine whether EPA has acted arbitrarily in responding to new information that petitioners and others have brought to its atten-

tion.[59] Petitioners asked EPA to put fugitive emissions within the purview of the final BOPF opacity standard promulgated on April 13, 1978;[60] in effect, they sought to have the agency revise the preexisting BOPF performance standard to include secondary emissions. Petitioners did so, however, in the context of rulemaking proceedings designed only to consider and formulate an opacity standard for primary emissions,[61] and on that account EPA denied their request.[62]

Given the history behind bifurcation of the rulemaking proceedings leading to BOPF performance standards,[63] as well as the agency's prior explanations of the then unfeasibility of trying to develop a fugitive emission standard[64] and the functional relationship between the particulate and opacity standards,[65] we find little merit in petitioners' assertions that EPA failed either to support its decision to omit fugitive emissions or to explain adequately its reasons therefor. Moreover, when EPA published the final opacity standard, it simultaneously gave notice of its intention to inaugurate another rulemaking proceeding for the purpose of devising an amended standard that would accomplish precisely what petitioners sought.[66] Petitioners have not pointed to anything that would suggest that the agency is not now preparing to do just that.[67]

---

**52.** See Brief for Respondents at 21.

**53.** See text *supra* at note 14.

**54.** See notes 57, 68 *infra.*

**55.** See, *e.g. Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–241, 57 S.Ct. 461, 464, 81 L.Ed. 617, 621 (1937).

**56.** See note 68 *infra.*

**57.** Letter from Earl Salo, Attorney, EPA Air, Noise and Radiation Division, to George A. Fisher, Clerk, United States Court of Appeals for the District of Columbia Circuit, June 19, 1981, 4.

**58.** Thus, although our holding on the merits relies upon the agency's decision to institute separate rulemaking proceedings to consider regulation of secondary BOPF emissions, see Part II(C) *infra*, we reject the contention that mere contemplation of such proceedings suffices to moot the controversy.

**59.** *Oljato Chapter of Navajo Tribe v. Train, supra* note 43, 169 U.S.App.D.C. at 207–208, 515 F.2d at 666–667; see *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–826, 28 L.Ed.2d 136, 153 (1971); 5 U.S.C. § 706(2)(A) (1976).

**60.** See text *supra* at note 29.

**61.** See text *supra* at notes 28–31.

**62.** See text *supra* at note 31.

**63.** See text *supra* at notes 25–33.

**64.** See text *supra* at note 18.

**65.** See text *supra* at notes 21–23.

**66.** See text *supra* at notes 30–32.

**67.** But see note 52 *supra.*

Having decided upon an effort to broaden its regulations to control fugitive emissions—the very relief petitioners demanded—EPA cannot soundly be charged with arbitrariness merely because it chose a separate rulemaking proceeding as the process for proposing a revised standard in lieu of an undertaking to do so in the narrower context of the opacity standard proceedings as petitioners requested.[68] And in view of the extensive "testing problems" presented and the "complex and evolving" fugitive emission control technology implicated,[69] we think it was reasonable for the agency to establish the separate rulemaking agenda it did. The order under review is accordingly

*Affirmed.*

### SEPARATE STATEMENT OF CIRCUIT JUDGE ROBB *

ROBB, Circuit Judge:

The majority opinion recognizes that the Environmental Protection Agency has now commenced rulemaking procedures looking to the promulgation of regulations to control fugitive emissions. This is the relief petitioners demand, and their only com-

plaint now is that the agency is not moving fast enough. In these circumstances I think the case should be dismissed as moot.

---

68. Now that EPA has settled upon rulemaking proceedings that may be lead to secondary as well as primary BOPF emission standards, petitioners' *only surviving complaint is that the* agency is not doing so fast enough. Petitioners point to § 111(b)(1)(B) of the Act, which specifies that proposed regulations be issued within 120 days of the identification of new statutory sources of air pollution, and that final standards be promulgated within another 90 days. 42 U.S.C. § 7411(b)(1)(B) (Supp. III 1979); see Reply Brief for Petitioners at 18–20. At oral argument, we requested the agency to submit its timetable for promulgating new source performance standards for fugitive emissions from basic oxygen process furnaces. This the agency did, and the schedule called for issuance of proposed regulations by April, 1981, and the promulgation of final standards by February, 1982. In the letter accompanying the schedule, the agency stated:

In the judgment of the EPA engineers in the Office of Air Quality Planning and Standards, the schedule for promulgating the BOPF fugitive emission standard is an ambitious schedule which will be especially difficult due to the test method required to be used and testing problems which are presented and because the technology is complex and evolving. Those engineers believe that it

would be virtually impossible to accelerate the schedule and still produce a credible standard that could withstand judicial review. Thus, it should be concluded that EPA's schedule is an expeditious means of promulgating the BOPF fugitive emission standard. Letter from Patrick J. Cafferty, Jr., EPA Pollution Control Section, to George A. Fisher, Clerk, United States Court of Appeals for the District of Columbia Circuit, Oct. 1, 1979, 4. Counsel for EPA subsequently informed us that, because of additional complications, unforeseen earlier, promulgation of the proposed standard would be impracticable prior to January, 1982. See note 57 *supra.* In view of these problems, we are unwilling to secondguess the agency's judgment concerning the time necessary to study the developing technology of secondary emission capture and control and to issue regulations that reflect that technology, particularly so when the agency's timetable does not appear to be unduly protracted.

69. See Letter from Patrick J. Cafferty, Jr., EPA Pollution Control Section, to George A. Fisher, Clerk, United States Court of Appeals for the District of Columbia Circuit, Oct. 1, 1979, 4, quoted in part *supra* note 68.