874 F.2d 883
 29 ERC 1833, 57 USLW 2723, 19 Envtl.
L. Rep. 21,046
 STATE OF MAINE, et al., Plaintiffs, Appellants,
v.
Lee M. THOMAS, etc., et al., Defendants, Appellees.
 No. 88-1983.
 United States Court of Appeals,
First Circuit.
 Heard Feb. 6, 1989.
Decided May 18, 1989.
As Amended June 1, 1989.
 
 Gregory W. Sample, Asst. Atty. Gen., with whom James E. Tierney, Atty. Gen., State of Me., Augusta, Me., Jeffrey L. Amestoy, Atty. Gen., J. Wallace Malley, Jr., Asst. Atty. Gen., State of Vt., Montpelier, Vt., Robert Abrams, Atty. Gen., David R. Wooley, Asst. Atty. Gen., State of N.Y., Albany, N.Y., James M. Shannon, Atty. Gen., Janet G. McCabe, Asst. Atty. Gen., Boston, Mass., Com. of Mass., Cary Edwards, Atty. Gen., Paul Schneider, Deputy Atty. Gen., State of N.J., Trenton, N.J., Joseph I. Lieberman, Atty. Gen., New Haven, Conn., Brian Comerford, Asst. Atty. Gen., State of Conn., James E. O'Neil, Atty. Gen., Gary Powers, Asst. Atty. Gen., State of R.I., Providence, R.I., Howard I. Fox, Washington, D.C., Sierra Club Legal Defense Fund, James Tripp, Environmental Defense Fund, and Armond Cohen, Conservation Law Foundation of New England, were on brief for appellants.
 John C. Harrison, Dept. of Justice, Washington, D.C., with whom Roger J. Marzulla, Asst. Atty. Gen., Richard S. Cohen, U.S. Atty., David C. Shilton, Dept. of Justice, Washington, D.C., and Gregory B. Foote, Office of General Counsel, E.P.A., were on brief for defendants, appellees.
 Henry V. Nickel with whom Michael L. Teague, Norman W. Fichthorn, Hunton & Williams, Washington, D.C., John B. Weldon, Jr., Elizabeth Ann Rieke, and Jennings, Strouss & Salmon, Phoenix, Ariz., were on brief, for intervenors, appellees Alabama Power Co., et al.
 Before SELYA, Circuit Judge, ALDRICH and COFFIN, Senior Circuit Judges.
 SELYA, Circuit Judge.
 
 
 1
 The Clean Air Act, 42 U.S.C. Sec. 7401 et seq. (Act), embodies one of this nation's greatest aspirations, attempting to reconcile the polity's desire for pristine air with its equally fervent desire for the benefits of life in a modern industrial economy. Congress recognized that the reconciliation of these often-conflicting desires required resources, time, and institutional commitment. Having codified the goal ("to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population," 42 U.S.C. Sec. 7401(b)(1)), Congress entrusted the mandate of the Act to the Environmental Protection Agency (EPA or the Agency).[1]
 
 
 2
 At the same time, Congress empowered the citizenry to superintend the Agency's progress toward meeting the Act's objectives by means of (i) citizen suits to compel observance of nondiscretionary duties, 42 U.S.C. Sec. 7604(a)(2), and (ii) petitions to review final Agency action, 42 U.S.C. Sec. 7607. The specifications which Congress set for these remedial vehicles necessitate that they be driven in different lanes; whereas citizen suits are prosecutable in federal district courts, 42 U.S.C. Sec. 7604(a), jurisdiction over review petitions lies exclusively with the courts of appeal. As to "nationally applicable" regulations, review petitions can only be brought in the United States Court of Appeals for the District of Columbia; as to regulations of local concern, such petitions are prosecutable in other "appropriate circuit [courts]"). 42 U.S.C. Sec. 7607(b).[2]
 
 
 3
 Unsurprisingly, this jurisdictional dichotomy has created a confused class of circumforaneous litigants, wandering perplexedly from forum to forum in search of remediation. In this case, seven northeastern states and several environmental groups (collectively, appellants) filed suit in the United States District Court for the District of Maine to compel EPA to promulgate regulations designed to deal with the atmospheric blight known as "regional haze." Sixty-four electric utilities and a trio of trade associations intervened as defendants. The district court ruled that it did not have jurisdiction to hear the complaint. Maine v. Thomas, 690 F.Supp. 1106 (D.Me.1988). We believe that the right result was reached and, although our reasoning is somewhat different, we affirm.
 
 
 4
 * "Regional haze" (sometimes called "uniform haze") is "widespread, regionally homogeneous haze from a multitude of sources which impairs visibility in every direction over a large area." 45 Fed.Reg. 80,084, 80,085 (1980). It may cover broad expanses, move over long distances, linger unduly, and reduce visibility in places which have few (if any) manmade emission sources. EPA's mandate to control the vexing problem of regional haze emanates directly from the Clean Air Act, which "declares as a national goal the prevention of any future, and the remedying of any existing, impairment of visibility in mandatory class I Federal areas which impairment results from manmade air pollution." 42 U.S.C. Sec. 7491(a)(1).[3]
 
 
 5
 Congress did not leave "progress toward meeting the national goal" entirely to the Agency's discretion. 42 U.S.C. Sec. 7491(a)(4). Quite the contrary: it charted an administrative course to guide EPA in its endeavors. The first way station relevant to this case is the August 1979 deadline requiring the Agency to "promulgate regulations to assure" that "reasonable progress" would indeed be made "toward meeting the national goal...." Id. Congress' cartographical projections from that point forward were considerably less precise. But, the "reasonable progress" stipulation also referred to "compliance with the requirements of [section 7491]," id., including the requirement which constitutes the second relevant way station. That pit stop was inexactly placed, requiring that state implementation plans include a "strategy for making reasonable progress toward meeting the national goal" within "ten to fifteen years." 42 U.S.C. Sec. 7491(b)(2)(B). Construing the ten to fifteen year requirement as dating from the 1979 deadline, and not the 1977 enactment of the Act itself, the next statutory deadline would have to be met between 1989 and 1994. EPA played the laggard. It was not until after it had been sued for recalcitrance and entered a settlement and consent decree[4] that it issued regulations. See 45 Fed.Reg. at 80,084-95. The 1980 regulations classified air pollution impairing visibility as either plume blight ("[s]moke, dust, colored gas plumes, or layered haze ... which obscure the sky or horizon and are relatable to the single source or a small group of sources") or regional haze, id. at 80,085, and treated the two categories separately.
 
 
 6
 The rules and orders which EPA promulgated to control plume blight proved uncontroversial, and are not in issue in this case. As to regional haze, the rulemaking amounted to the Agency's promise to deal substantively with the matter in future rules and orders. At the time, EPA argued that technology and knowledge were not sufficiently sophisticated to allow it to monitor, model, and fully understand regional haze. 45 Fed.Reg. at 80,085-86. Accordingly, the Agency announced that "[f]uture phases [of its regulations] will extend the visibility program by addressing more complex problems such as regional haze...." Id. at 80,086. Appellants--and other concerned parties--grudgingly accepted the olive branch, wispy though it was. They did not ask for review of the Agency action under section 7607, but countenanced EPA's open-ended assurances rather than rush to the courthouse.
 
 
 7
 Six years elapsed without further rulemaking. Calendar pages had yellowed by the thousands, but EPA still had not produced the promised regulations. Notwithstanding the counsel of the Greek philosophers that "[h]ealing is a matter of time," Hippocrates, Precepts, and that "[t]ime eases all things," Sophocles, Oedipus Rex, in this instance the inordinate delay, understandably, rubbed salt in an open wound. Appellants' patience worn wafer-thin, they sued to compel fulfillment of the lapsed promise. Asserting that the Agency's 1980 rulemaking was not a "final action taken" under 42 U.S.C. Sec. 7607(b),[5] appellants eschewed either an administrative filing or an attempted review petition. Instead, citing EPA's alleged disregard of what appellants characterized as a nondiscretionary duty to combat visibility impairment (embodied in 42 U.S.C. Sec. 7491), they premised jurisdiction on 42 U.S.C. Sec. 7604 and went directly to the district court. The reception was frosty; the court ruled that promulgation of the earlier (1980) regulations--called by the parties in interest the "Phase 1 regulations"--constituted final action, reviewable only in a court of appeals under 42 U.S.C. Sec. 7607(b). Maine v. Thomas, 690 F.Supp. at 1110-12. Following dismissal of their case on jurisdictional grounds, plaintiffs appealed.
 
 II
 
 8
 The threshold question, of course, is whether EPA's 1980 promise comprised a "final action taken" for purposes of 42 U.S.C. Sec. 7607(b). No one questions that the aspects of the Phase 1 regulations which dealt with plume blight were final in the classical sense: they brought definition to, and controlled, one facet of visibility impairment. But, the remaining aspect of the regulations--the promise to act in futuro--may also be a final action taken; and if so, would be subject to review only in the Court of Appeals for the District of Columbia Circuit--and then, only within 60 days of the date of the regulatory enactment. See id.
 
 
 9
 At this juncture, we resist the temptation to become too "abstract and conceptual," Natural Resources Defense Council, Inc. v. Train, 510 F.2d 692, 714 (D.C.Cir.1974), or to elevate "form over substance." Environmental Defense Fund, Inc. v. Costle, 448 F.Supp. 89, 93 (D.D.C.1978). We attempt instead to glean the essence of, and the rationale for, EPA's Phase 1 regulations. The result, we think, is clear: Phase 1 represented EPA's assessment of what might reasonably be done in 1980. Its assessment of its capacity to understand the problem of regional haze went unreviewed, as did its decision to bifurcate the visibility problem (plume blight being treated one way, regional haze another), because neither was challenged within the 60-day period provided by section 7607. As the district court correctly noted, not only were the plume blight regulations properly developed, but the decision to postpone regional haze regulations "was based on an extensive and published administrative record which reflects citizen and agency concerns, the intent to defer, and a rationale based on [the lack of adequate] technological and scientific information." Maine v. Thomas, 690 F.Supp. at 1111-12.[6]
 
 
 10
 We find no error in the district court's reading of the record in this regard. Vis-a-vis regional haze, Phase 1 was a final action in the relevant sense, that is, when the regulations were promulgated in December 1980, all proper procedures had been followed for rulemaking and the resultant announcement satisfied (albeit 18 months after the statutory deadline) the requirement for making "reasonable progress toward meeting the national goal...." 42 U.S.C. Sec. 7491(a)(4). While "reasonable progress" is not the only, or even the definitive, test for finality, it is an excellent proxy. Furthermore, we deem it open to take the inaction of appellants, and others, in the 60 days after Phase 1 was promulgated as an informal confirmation that EPA's action was final. Bluntly put, if any citizen felt that EPA's promise (1) masked its capacity to take action, (2) would serve as grounds for future delay, or (3) simply left the regulatory pace too unsure, that was the time to challenge Phase 1, in part or in whole. We are more than a little skeptical that veterans of the legal skirmishes which have regularly marked the development of the American administrative apparatus would have placed absolute faith in the goodwill of any agency regularly named by them as a defendant. Promissory or not, the 1980 disposition of the regional haze problem met the statutory test for regulatory action and could have been challenged within 60 days of promulgation had any citizen felt that Phase 1 failed to observe the statutory mandate.
 
 
 11
 Especially significant, and in our view controlling, is that Phase 1 made a "change in the status quo itself ...," thus rendering the regulation ripe for review. Roosevelt Campobello Int'l Park Comm'n v. United States Envtl. Protection Agency, 684 F.2d 1034, 1040 (1st Cir.1982). A challenge to Phase 1 would neither have forced a court to entangle itself "in abstract disagreement over administrative policies ...," nor have subjected EPA to "judicial interference [before] an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 1515-16, 18 L.Ed.2d 681 (1967). While the plume blight regulations are paradigmatic examples of an order ripe for review, the temporizing "promise" anent uniform haze, given the congressional mandate and the state of the art, was a bit greener at the edges--but also ripe.
 
 
 12
 We also take cognizance that at the time Phase 1 was promulgated, Congress and the courts had acted in ways suggestive, explicitly and implicitly, that a decision to postpone action constituted a final action for purposes of 42 U.S.C. Sec. 7607. For instance, Congress amended the Clean Air Act in 1977 to add the words "final action" to 42 U.S.C. Sec. 7607. It did so to clarify "whether there could be concurrent jurisdiction in the court of appeals and the district court when the Administrator had acted, though allegedly not far enough, in a way which constituted a refusal to perform a mandatory duty." Environmental Defense Fund, 448 F.Supp. at 92. In that case, EPA postponed implementing certain regulations developed under amendments to the Act, regulations which had emerged after appropriate administrative proceedings. Id. at 93. The court emphasized the breadth of the "final action" taxonomy. Id. at 92. Having determined that EPA gave the public adequate notice that the deferral was a final action because "in the preamble the Administrator clearly states and explains his decision to defer ...," id. at 93, the court held that "the Administrator had taken a final action as to the issue of whether Sec. 165 [of the Act] was to be immediately effective." Id.
 
 
 13
 This case involves far fewer ambiguities than Environmental Defense Fund. There, EPA set out the deferral and explanation in the regulatory preamble, a dubious method at best. Id. at 93 & n. 11. Here, EPA announced Phase 1 as a regulatory scheme, fully explained and defended in the text setting out the regulations. Furthermore, the administrative proceedings had directly addressed the possibility that regional haze rules and orders might be delayed. To mince no words, the decision to defer constituted a fully developed part of the final action taken on the statutory mandate. Indeed, it is no exaggeration to say that EPA announced this final action--the phased approach--as its response to Congress' command. Because a final action need not consist solely of standard rules or orders, we agree "that EPA intended to limit the [1980] regulations to plume blight." Vermont v. Thomas, 850 F.2d 99, 103 (2d Cir.1988). Nonetheless, the final action taken has legal effect and establishes procedural requirements, such as substantive conditions and consequent deadlines, for establishing future phases.
 
 
 14
 There is a second furculum to the threshold question, but it points in the same direction. Appellants argue not only that the Court of Appeals for the District of Columbia Circuit lacked jurisdiction (because EPA's "promise" was not a "final action"), but that the district court possessed jurisdiction (because the statute imposed a nondiscretionary duty on the Agency immediately to regulate visibility-impairing pollution, which duty was ignored). In this case, these arguments are necessary corollaries of each other--so it is unsurprising that the imagined duty did not exist in the stated terms. The statute merely imposed a requirement to regulate for "reasonable progress" and in "compliance with the requirements of this section." 42 U.S.C. Sec. 7491(a)(4). The "requirements" included "a long-term (ten to fifteen years) strategy for making reasonable progress toward meeting the national goal...." 42 U.S.C. Sec. 7491(b)(2)(B). The organic statute thus required regulatory provisions embodying a combination of actual rules and orders and a plan for implementing future rules and orders. The 1980 regulations, covering plume blight completely and announcing a plan of study and a promise of future rules and orders to deal with regional haze, albeit bereft of details, complied fully with EPA's nondiscretionary duty to take regulatory action.
 
 
 15
 To be sure, appellants argue that a nondiscretionary duty must contain an element whereby a court, or other reviewing authority, may test whether the duty has been fulfilled. As we have noted, that element is encompassed only in part in the substantive action required of EPA. Having discerned who was required to take what action, we believe that the appropriate check is to ask when the duty must be fulfilled. Our belief is apparently shared by the District of Columbia Circuit: "Although a date-certain deadline ... may or may not be nondiscretionary, it is highly improbable that a deadline will be nondiscretionary, i.e. clear-cut, if it exists only by reason of an inference drawn from the overall statutory framework." Sierra Club v. Thomas, 828 F.2d 783, 791 (D.C.Cir.1987). If we return for a moment to the organic statute, we note that between the initial 1979 deadline, 42 U.S.C. Sec. 7491(a)(4), and the next (1989-94) deadline, 42 U.S.C. Sec. 7491(b)(2)(B), no other deadlines exist (and the 1989-94 deadline is only one for a "strategy," not for meeting the national goal itself). In short, by 1979 EPA was to have announced a plan of progress that would have its impact upon the states' implementation plans by the end of the 1989-94 time frame. While the second deadline looms near, the first has long since passed. No interim nondiscretionary duties exist. Accordingly, the district court lacked subject matter jurisdiction.[7]
 
 III
 
 16
 We consider two other lines of attack which appellants doggedly pursue.
 
 
 17
 First, they argue that the Phase 1 regulations, insofar as they affect regional haze, were essentially unreviewable, ergo, those regulations could not be tantamount to final action. Appellants are wrong. If challenged, the premises for postponed regulation could well have been reviewed by the District of Columbia Circuit.
 
 
 18
 EPA asserted, after all, scientific and technological incapacity, and did so not only after fulfilling the requirements of its regulatory apparatus but also in response to a settlement agreement. See supra at 885 & note 4. Surely a court could have assessed whether the record adequately supported EPA's decisions and decided whether the promise of future regulation adequately harmonized with the Agency's nondiscretionary duty to progress toward the national goal. Such a challenge would have presented claims against a backdrop "sufficiently concrete to allow for focus and intelligent analysis ...," and would not have forced the court to decide "issues unnecessarily, wasting time and effort." Roosevelt Campobello, 684 F.2d at 1040.
 
 
 19
 The flip side of the coin betokens the same result. EPA could hardly have regarded review in 1980 as "premature," because it made its promise precisely in order "to refine, revise [and] clarify the particular ... matter at issue ... thus creating a consensus among the parties [and] avoiding the need for court proceedings." Id. We would fashion a perverse paradox were we to posit that a promise which arose out of wrangling in court, a promise made in order to avoid more such wrangling, a promise which actually represented the consensus of litigant-adversaries, was not a final administrative action and therefore not subject to review. For, if it were not subject to review, then it would in turn simply spawn more section 7604 actions, each resolvable, ultimately, by an unreviewable promise. Even Kafka would have found it difficult to devise a more twisted antilogy.
 
 
 20
 The other proposition advanced by appellants is that Congress could not have intended persons confronted by a governmental promise of some future action to rush headlong to a federal court, or else forever hold their peace. The sovereign's word, they contend, should be its bond; and if its word proves to be mendacious, then reliant citizens should not be left holding an empty bag. The asseveration has a certain appeal--but the claim of massive inequity cannot withstand scrutiny. Appellants, even at this late date, are not remediless. While the district court lacks jurisdiction, and a frontal challenge in the court of appeals is no longer timely, compliance with the promise can be enforced.
 
 
 21
 EPA remains under a double-barreled duty, statutory and self-imposed under the terms of the promised (phased) rulemaking, 45 Fed.Reg. at 80,084-86, to deal with regional haze. By failing to contest the Agency's assurance when given, appellants to some extent left the timetable in EPA's own hands. But, appellants retain an entitlement to petition EPA for action "based solely on grounds arising after ..." the time for challenging the 1980 promise had expired. 42 U.S.C. Sec. 7607(b)(1). If EPA refuses to act on the new grounds, appellants may yet obtain judicial review before the District of Columbia Circuit if they choose to follow the entrenched precedent which precisely details the steps to be taken in order to compel the Agency to revise, and thereby fulfill, Phase 1. Let us explain.
 
 
 22
 In announcing Phase 1, EPA restricted its own discretion. The regulation describing "future phases" was phrased in mandatory, not discretionary, terms:
 
 
 23
 We will propose and promulgate future phases when improvement in monitoring techniques provides more data on source-specific levels of visibility impairment, regional scale models become refined, and our scientific knowledge about relationships between emitted air pollutants and visibility impairment improves.
 
 
 24
 45 Fed.Reg. at 80,086 (emphasis supplied). We agree with the Second Circuit that the mandatory language neither allows nor compels the states to develop implementation plans "for the evolution of long-term strategies combating regional haze." Vermont v. Thomas, 850 F.2d at 103. The effect of the language on EPA, however, is quite another matter.
 
 
 25
 The Clean Air Act specifically provides that its rulemaking provisions shall apply to "revision of regulations ... relating to prevention of significant deterioration of air quality and protection of visibility[.]" 42 U.S.C. Sec. 7607(d)(1)(I).[8] Without fully recapitulating the exhaustive study of legislative history undertaken by the District of Columbia Circuit, we simply note our agreement in the conclusion that Congress intended citizens to have an ability to confront EPA with new information arguably sufficient to merit revision of extant regulations. See Group Against Smog & Pollution, Inc. v. United States Envtl. Protection Agency, 665 F.2d 1284, 1289-90 (D.C.Cir.1981). We approve the procedures suggested by the Agency and "explicitly endorsed" by our sister circuit:
 
 
 26
 (1) The person seeking revision of a standard of performance, or any other standard reviewable under Sec. 307, should petition EPA to revise the standard in question. The petition should be submitted together with supporting materials, or references to supporting materials.
 
 
 27
 (2) EPA should respond to the petition and if it denies the petition, set forth its reasons.
 
 
 28
 (3) If the petition is denied, the petitioner may seek review of the denial in [the D.C. Circuit] pursuant to Sec. 307.
 
 
 29
 Id. at 1290 (footnote omitted); see also Oljato Chapter of Navajo Tribe v. Train, 515 F.2d 654, 666 (D.C.Cir.1975); Union Electric Co. v. Environmental Protection Agency, 515 F.2d 206, 220 (8th Cir.1975), aff'd, 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976).
 
 
 30
 Here, EPA bound itself to "propose and promulgate future phases" anent uniform haze when improved monitoring techniques yield data, when models become refined, and when scientific knowledge improves. 45 Fed.Reg. at 80,086. If appellants have collected evidence sufficient to demonstrate that those conditions are now satisfied, they need only petition EPA to trigger new rulemaking. So long as the evidence suffices, the Agency--given the phrasing of the Phase 1 regulations--could reject such a petition only if it rescinded those aspects of Phase 1 binding it to rulemaking based on a limited set of factors. (Any such rescission, of course, would require implementation of a full and appropriate rulemaking procedure.)
 
 
 31
 Though the question of the binding force of regulations and procedures[9] on the promulgating agency has never arisen under the Clean Air Act to our knowledge, we find that question to be easily answerable by analogous precedent. EPA's very claim that Phase 1 was final when issued, and thus possessed a stipulated jurisdictional effect, is equivalent to a claim sotto vocce that Phase 1 from the outset had the force of law, affecting the rights of citizens to enforce statutory duties. And it is settled that:
 
 
 32
 Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where internal procedures are possibly more rigorous than otherwise would be required.
 
 
 33
 Morton v. Ruiz, 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974) (citations omitted) (discussing self-imposed procedures of Board of Immigration Appeals). Other examples are legion. See, e.g., United States v. Nixon, 418 U.S. 683, 695-96, 94 S.Ct. 3090, 3101-02, 41 L.Ed.2d 1039 (1974) (agency may "den[y] [it]self the authority to exercise the discretion delegated ... and ... could reassert it by amending the regulations"); Kelly v. Railroad Retirement Bd., 625 F.2d 486, 492, 491-92 (3d Cir.1980) ("Failure to comply with its regulations renders the agency's act null."); North Georgia Bldg. & Constr. Trades Council v. Goldschmidt, 621 F.2d 697, 710 (5th Cir.1980); Mead Data Cent., Inc. v. United States Dep't of Air Force, 566 F.2d 242, 258 (D.C.Cir.1977); Doraiswamy v. Secretary of Labor, 555 F.2d 832, 843 (D.C.Cir.1976); Cruz-Casado v. United States, 553 F.2d 672, 675, 213 Ct.Cl. 498 (1977); Nader v. Nuclear Regulatory Comm'n, 513 F.2d 1045, 1051 (D.C.Cir.1975); Schatten v. United States, 419 F.2d 187, 191 (6th Cir.1969); Pacific Molasses Co. v. Federal Trade Comm'n, 356 F.2d 386, 389-90 (5th Cir.1966); Elmo Div. of Drive-X Co. v. Dixon, 348 F.2d 342, 346 n. 5 (D.C.Cir.1965) (per curiam).
 
 
 34
 EPA has, in a final action, met the mandatory burden of 42 U.S.C. Sec. 7491(g)(1) that "[i]n determining reasonable progress there shall be taken into consideration the costs of compliance, the time necessary for compliance, and the energy and nonair quality environmental impacts of compliance, and the remaining useful life of any existing source subject to such requirements[.]" In the process, the Agency committed itself to promulgating new regulatory phases based on a certain set of conditions. The content of those phases may well be affected by the requirements of section 7491(g)(1), but EPA, in light of its earlier promise, cannot now reject a rulemaking petition on such grounds. For that reason, appellants' portrayal of the inequities of their plight strikes us as overblown.
 
 IV
 
 35
 We summarize our journey through the labyrinth. EPA's actions in 1980 represented a rulemaking consensus that it could deal substantively with plume blight but not with regional haze. The Phase 1 regulations, though entirely promissory in respect to regional haze, nevertheless amounted to "final action taken" within the ambit of 42 U.S.C. Sec. 7607(b)(1). It necessarily follows that no citizen suit lies under 42 U.S.C. Sec. 7604, and that appellants incorrectly attempted to invoke the jurisdiction of the district court in their challenge to the lengthy period of dormancy which followed EPA's announcement of the Phase 1 regulations. Although we believe that there is a route whereby citizens may require EPA to act on self-imposed duties when self-imposed conditions have been met, see supra Part III, that route does not pass through the district court.
 
 
 36
 We need go no further. Because plaintiffs' present peregrinations have wandered far from the proper path, the district court's dismissal of the action for want of subject matter jurisdiction must be
 
 
 37
 Affirmed.
 
 APPENDIX A
 
 38
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 TABLE
 
 
 [1]
 Although the Act refers to the Administrator of the EPA as nominally responsible for Agency action, 42 U.S.C. Sec. 7602(a), we do not stand on ceremony. For the sake of simplicity, we refer to rulemaking action as that of EPA itself
 
 
 [2]
 Because the jurisdictional interplay between these statutes is intricate, and because the core dispute in this case involves their applicability, or not, to the idiocratic situation at hand, we attach the full text of 42 U.S.C. Secs. 7604, 7607 as an appendix
 
 
 [3]
 A "Class I Federal area" is defined as an international park, a national wilderness or memorial park area which exceeds 5,000 acres, or a national park spanning more than 6,000 acres. 42 U.S.C. Sec. 7472(a)
 
 
 [4]
 The consent decree was entered in the United States District Court for the District of Columbia. See Friends of the Earth v. Costle, No. 79-3211 (D.D.C.1979)
 
 
 [5]
 Appellants concede that, if section 7607 applied and their remedy was by petition for review in a designated court of appeals, then section 7604 would have no pertinence, and there would be no hook upon which district court jurisdiction might be hung. Finality-based jurisdiction under section 7607 and district court jurisdiction under section 7604 are mutually exclusive. Environmental Defense Fund, Inc. v. Costle, 448 F.Supp. 89, 92-93 (D.D.C.1978)
 
 
 [6]
 While the district court apparently thought the existence of an adequate administrative record to be virtually decisive, we are not inclined to attach the same degree of significance to the determination. Had the district court found the record inadequate, it could have "compile[d] a record limited to reconstructing, as distinct from supporting or refuting, the agency's reasoning process." Bethlehem Steel Corp. v. United States Envtl. Protection Agency, 782 F.2d 645, 656 (7th Cir.1986)
 
 
 [7]
 This is not a case of "[r]ecalcitrance in the face of duty." Sierra Club, 828 F.2d at 793-94. EPA fulfilled its statutory duty here; its recalcitrance, if any, lies not in its failure to meet a deadline imposed by Congress, but rather in a failure to meet self-imposed regulatory deadlines, premised on event-specific and technological happenings, regulatory deadlines which the Agency created in the course of meeting the statutory deadline. Such regulatory duties are perhaps nondiscretionary, but they are not statutory nondiscretionary duties; hence, they are not proper grist for the section 7604 mill
 
 
 [8]
 The district court did, at one point, indicate that a petition for rulemaking under the Administrative Procedure Act (APA), specifically 5 U.S.C. Sec. 553(e), might lie. See Maine v. Thomas, 690 F.Supp. at 1111 n. 19. Although we agree that a petition for rulemaking may be a proper antidote for the ailment which grips appellants presently, the district court was wrong in suggesting that the APA would apply. The Clean Air Act is generally a self-contained statute and all relevant rulemaking must be conducted according to the procedures which the Act prescribes. See 42 U.S.C. Sec. 7607(d)(1); see also 42 U.S.C. Sec. 7607(c) (Clean Air Act's review procedure is exclusive). In those few instances when the APA is relevant to rulemaking under the Clean Air Act, its procedures are specifically adopted by reference, e.g., 42 U.S.C. Sec. 7607(d)(3) (setting out notice procedure by reference to APA)
 
 
 [9]
 We need not trifle with semantics. Whether EPA's promise to act constituted a regulation or a procedure is, in this instance, of no moment. Under either rubric, the promise had the force of law and, because the mandatory language removed any discretion (EPA must act when certain conditions take place), the cognomen which we append to the promise is immaterial. Formalistic labeling plays no legitimate part in analyzing actual rights and duties under the Act. See, e.g., Environmental Defense Fund, 448 F.Supp. at 93